# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UPPER DECK INTERNATIONAL B.V., a Netherlands corporation,<br><br>                              Plaintiff,<br><br>        vs.<br><br>THE UPPER DECK COMPANY, a California corporation; THE UPPER DECK COMPANY, a Nevada Corporation; RICHARD McWILLIAM, an individual; and DOES 1-10,<br><br>                              Defendants. | CASE NO. 11cv1741-LAB (CAB)<br><br>**ORDER ON PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS AND MOTION TO STRIKE DEFAMATION COUNTERCLAIM** |

Upper Deck International filed this lawsuit on August 4, 2011.  It named three Defendants: (1) Upper Deck California; (2) Upper Deck Nevada; and (3) Richard McWilliam. These Defendants answered separately on September 29, 2011, and Upper Deck Nevada filed a counterclaim.  This counterclaim named not only Upper Deck International as a defendant, but also an individual by the name of Nico Blauw.  Amendments followed.

First, Upper Deck Nevada filed an amended counterclaim on December 12, 2011 that Richard McWilliam joined—and that also named two new defendants: Blue Ocean Entertainment and Larissa Blauw.

//

1    Second, Upper Deck International filed an amended complaint on January 3, 2012.

2    There are now three motions pending before the Court.  The first is Upper Deck

3    International's motion to dismiss the counterclaims filed by Upper Deck Nevada and

4    McWilliam.  The second is Nico Blauw's motion to dismiss or strike the counterclaims.  The

5    third is a joint motion, by both Upper Deck International and Nico Blauw, to strike a

6    defamation counterclaim under California's anti-SLAPP statute.

7                                    **BACKGROUND**

8    **I.    Upper Deck International's Complaint**

9        UDI's grievances against UDC[1] stem from two seemingly unrelated series of events.

10   The first series involves a web of distributor agreements that both parties separately entered

11   into with Konami Digital Entertainment, and both of which slid into litigation.  Here, UDI's

12   core grievance is that its business relationship with KDE soured on account of UDC's

13   conduct.  The second series of events involves alleged counterfeiting on UDC's part that,

14   according to UDI, has damaged its own reputation and business prospects.

15       **A.    The Konami Affair**

16       Konami Digital Entertainment, or KDE, manufactures a trading card game called Yu-

17   Gi-Oh!.  Around September 2006, KDE entered into distributor agreements with UDI and

18   UDC.  UDI became the exclusive distributor of Yu-Gi-Oh! in Europe, and UDC became the

19   exclusive distributor of Yu-Gi-Oh! in North America, South America, and Oceania. (Actually,

20   UDI's agreement was a sub-distributor agreement with Upper Deck Panoceanic, which

21   seems not to be that important of a fact.)   For convenience, we can refer to UDI's

22   agreement as the Europe Contract and UDC's agreement as the America Contract. (*See*

23   FAC ¶¶ 9–12.)

24       The Europe Contract contained a so-called "Domino Clause" that allowed KDE to

25   terminate it immediately *if* the America Contract was rightfully terminated.  In other words,

26   UDI's relationship with KDE turned to some degree on UDC's relationship with KDE.  If UDC

27

28       [1] The Court will follow UDI's convention and refer to Upper Deck California and Upper Deck Nevada collectively as "UDC."

violated the terms of its distributor agreement, UDI's distributor agreement would be in jeopardy. And that, according to UDI, is what happened. In 2008, UDC began producing and distributing counterfeit Yu-Gi-Oh! cards. KDE promptly terminated the America Contract, sued UDC in the Central District of California, and invoked the Domino Clause to threaten UDI with termination of its Europe Contract. (*See* FAC ¶¶ 13–17.)

McWilliam, a member of UDC's board of directors, assured UDI's Chief Executive Officer Nico Blauw that UDC had done nothing wrong. Relying on that, UDI took legal action in Europe against KDE to forestall KDE's invocation of the Domino Clause and to save the Europe Contract. UDI succeeded, and the two companies continued to do business. Things took a turn for the worse, however, in April 2009. Around that time, McWilliam admitted to both UDI and KDE that UDC had, in fact, counterfeited Yu-Gi-Oh! cards. KDE then effectively re-invoked the Domino Clause to terminate its distributor agreement with UDI; it refused to fulfill Yu-Gi-Oh! orders placed by UDI, and it also refused to refund money advanced by UDI to pay for those orders. (*See* FAC ¶¶ 18–20.)

Meanwhile, KDE and UDC were still involved in litigation in the Central District of California, but were making efforts to settle. According to UDI, UDC needed money to settle, and in January 2010 UDI agreed to loan UDC $1 million, to be repaid by April 2010. UDI made this loan on the assumption that if KDE settled with UDC in the Central District of California, the settlement would also resolve KDE's dispute with UDI in Europe. It didn't. In fact, UDC represented during settlement negotiations that UDI didn't want to settle its dispute with KDE jointly with UDC (and it represented to UDI that KDE wasn't interested in a global settlement, either), and as a result KDE continued to pursue legal action against UDI in Europe. (*See* FAC ¶¶ 21–24.)

In the end, KDE sought $64 million in damages from UDI, and UDI, as a result of its contentious relationship with KDE, lost millions of dollars in revenue from the sale of Yu-Gi-Oh! cards. Its business reputation was also tarnished, costing it relationships with existing suppliers and prospective relationships with new suppliers. UDI attributes all of this to its association with UDC and UDC's own counterfeiting scheme. Finally, UDC hasn't repaid

1  UDI any of the $1 million that it borrowed—and $70,000 in interest has accrued.  (*See* FAC

2  ¶¶ 25–26.)

3  **B.    Counterfeiting**

4  On top of UDC's alleged counterfeiting of Uh-Gi-Oh! cards, UDI alleges that UDC has

5  also been counterfeiting "game-worn" jerseys, shreds of which are included in packs of

6  trading cards.  Word of this has circulated throughout the industry, and even though UDI

7  isn't involved in the counterfeiting, its own reputation and business relationships are

8  suffering.  So, here, again, UDI's core grievance is that UDC's conduct, over which it has

9  no control, is adversely affecting its own business interests.  (*See* FAC ¶¶ 27–41.)

10  **C.    UDI's Claims**

11  UDI asserts six claims against UDC.  The first claim is for breach of contract: UDC

12  borrowed $1 million from UDI and hasn't repaid it.  The second claim is for intentional

13  interference with contractual relations: UDC knew of UDI's Europe Contract and knew that

14  its own counterfeiting of Yu-Gi-Oh! cards would adversely affect UDI's own relationship with

15  KDE.  The third claim, based on roughly the same facts as the second claim, is for

16  intentional interference with prospective economic advantage.  The fourth claim, again

17  based on roughly the same facts as the second, is for negligent interference with

18  prospective economic advantage.  The fifth claim, against McWilliam, is for breach of

19  fiduciary duty: McWilliam, as a member of UDI's board of directors, breached his fiduciary

20  duties to UDI by counterfeiting Uh-Gi-Oh! trading cards, by counterfeiting game-worn

21  jerseys, and by disregarding and/or misrepresenting UDI's interests in negotiating its own

22  settlement with KDE.  The sixth and final claim, against UDC, and based on roughly the

23  same facts as the fifth claim, is for aiding and abetting McWilliam's breach of his fiduciary

24  duties.

25  **II.    UDC's Counterclaim**

26  UDC opens its counterclaim with a flat rejection of UDI's account of the facts.  The

27  $1 million loan was hardly a loan; rather, UDI owed another member of the Upper Deck

28  family $7.2 million and the $1 million was to be deducted from that amount.  (FACC ¶¶

14–20.) Also, UDC in no way disregarded UDI's own interests in its settlement negotiations with KDE; rather, UDC and KDE offered to incorporate a settlement of UDI's dispute into their own settlement and Nico Blauw, acting for UDI, refused to be a part of their settlement. (FACC ¶¶ 21–28.)

Having made these points, UDC's counterclaim takes the offensive against Nico Blauw, UDI's Chief Executive Officer, accusing him of serial and grave misconduct in his business dealings.

### A.   Allegations Against Blauw

UDC accuses Blauw, first, of negotiating an overpriced settlement with KDE that was driven largely by his own financial interests.  (As part of its lawsuit against UDI, KDE was successful in having Blauw's assets and bank accounts frozen.)  (*See* FACC ¶¶ 29–35.) It then moves on to a general statement of the various fiduciary duties Blauw owed UDI, followed by the general accusation that he breached those duties.  (FACC ¶¶ 36–40.)  For example, Blauw "made business decisions as director of UDI without an informed basis and lacking good faith" and "routinely made significant business decisions . . . without first seeking approval and consultation of UDI's Board of Directors."  (FACC ¶¶ 39–40.)

UDC's counterclaim accusations get more specific under the heading "Mr. Blauw's Mismanagement and Wrongful Withholding of UDI Financial Statements."  Here, UDC accuses Blauw of: (1) running an inefficient and wasteful business by, for example, overstaffing UDI (FACC ¶ 42); (2) generating incomprehensible financial statements, or failing to generate them at all (FACC ¶ 43); (3) denying McWilliam's repeated requests to view UDI's financials and business plan (FACC ¶¶45–56); (4) failing to provide UDI's outside accountants with UDI's financials, and delinquently filing those financials with the Dutch Chamber of Commerce (FACC ¶ 47); (5) filing earlier financials belatedly (FACC ¶ 48); and (6) filing UDI's VAT returns in 2010 late, creating problems with foreign tax authorities and exposing shareholders to liability (FACC ¶ 49).

UDC's most serious accusation is that over a two-year period from June 2008 to September 2010, while McWilliam was in and out of treatment for heart trouble and

1    chemical addiction, Blauw wrestled away 52.5 percent of UDI from him for a mere one Euro.

2    Blauw made these maneuvers despite the fact that McWilliam was trusting him to run UDC

3    and UDI from California while McWilliam was incapacitated, and despite his own awareness

4    of just how incapacitated McWilliam was.  (*See* FACC ¶¶ 50–67.)

5         **B.     Individual Counterclaims**

6         UDC asserts four counterclaims, and McWilliam asserts one.

7         The first counterclaim is a direct action against Blauw, and a derivative action against

8    Blauw and UDI, for breach of fiduciary duty.  UDC offers fifteen particular instances of

9    misconduct on Blauw's part that give rise to this claim, beginning with his misstatement of

10   UDI financials and ending with siphoning UDI corporate funds to pay for his personal legal

11   fees and expenses.  (*See* FACC ¶ 91.)

12        The second counterclaim is a direct action against Blauw, and a derivative action

13   against Blauw and UDI, for waste of corporate assets.  The factual bases for this claim are

14   a subset of the factual bases of the breach of fiduciary duty claim.  (*See* FACC ¶¶ 94–99.)

15        The third counterclaim, against UDI, Blauw, Blauw's company Blue Ocean

16   Entertainment, and Blauw's wife, is for conversion and embezzlement.  There are two bases

17   for this claim.  One is the allegedly fraudulent conveyance of McWilliam's majority interest

18   in UDI to Blauw.  The other is an intellectual property deal that Blauw concealed, and from

19   which he siphoned proceeds for his personal use.  (*See* FACC ¶¶ 100–105.)

20        The fourth counterclaim, against UDI and Blauw, asks for a declaratory judgment that

21   sets aside the purchase agreement whereby Blauw obtained a majority interest in UDI.

22   (*See* FACC ¶¶ 106–113.)

23        The fifth and final counterclaim, asserted by McWilliam, accuses UDI, Blauw, and

24   Blauw's wife of defamation and slander.  (*See* FACC 115–123.)

25                          **UDI'S MOTION TO DISMISS**

26        The Court will begin with UDI's motion to dismiss the counterclaims.

27   I.   **Subject Matter Jurisdiction**

28        Counterclaims may be either compulsory or permissive.  They're compulsory if they

"arise[ ] out of the transaction or occurrence that is the subject matter of the opposing party's claims" and "do[ ] not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1)(A). Otherwise, they're permissive. Fed. R. Civ. P. 13(b). Courts have supplemental jurisdiction over compulsory counterclaims, but permissive counterclaims require an independent basis for subject matter jurisdiction. *Martin v. Law Offices of John F. Edwards*, 262 F.R.D. 534, 536 (S.D. Cal. 2009); *Hart v. Clayton-Parker and Associates, Inc.*, 869 F.Supp. 774, 776 (D. Ariz. 1994). UDI argues that UDC's counterclaims are not compulsory and that there's no independent reason for the Court to exercise jurisdiction over them.

### A.    Are The Counterclaims Compulsory?

To be compulsory, UDC's counterclaims must arise out of the same "transaction or occurrence" as UDI's claims. Fed. R. Civ. P. 13(a)(1)(A); *Thompson v. Navigators Ins. Co.*, 2012 WL 1059931 at *3 (S.D. Cal. Mar. 28, 2012) ("Under Rule 13(a), counterclaims are compulsory if they exist at the time of the pleading and arise from the same transaction or occurrence as the complaint."). The Ninth Circuit uses a "logical relationship" test to determine whether claims and counterclaims arise out of the same transaction or occurrence. *Montana v. Goldin*, 394 F.3d 1189, 1196 (9th Cir. 2005). The operative question is "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Pochiro v. Prudential Ins. Co. of America*, 827 F.2d 1246, 1249 (9th Cir. 1987). The Court is mindful that the phrase "transaction or occurrence" should be broadly construed and that the issues in a claim and counterclaim needn't be precisely identical in order for the counterclaim to be compulsory. *Eagle Precision Technologies, Inc. v. Eaton Leonard Robolix, Inc.*, 2005 WL 6453556 at *4 (S.D. Cal. 2005).

In the Court's judgment, UDI's complaint is narrowly tailored to three sets of factual allegations. First, in the first half of 2008, UDC started counterfeiting Yu-Gi-Oh! cards, jeopardizing UDI's business relationship with KDE and ultimately leading KDE to take legal action against UDI in April 2010. (FAC ¶ 15; FACC ¶ 29.) Second, UDC borrowed $1

1    million from UDI to settle with KDE in January 2010, and UDC hasn't paid back a cent.

2    (FAC ¶¶ 21, 22, 26.)  Third, UDC has placed counterfeit game-worn jerseys in packs of

3    trading cards, damaging UDI's reputation and business prospects.  (FAC ¶¶ 27–41.)  Each

4    of UDI's six claims are tied, tightly, to one of these allegations.

5         UDC's allegations are scattershot in comparison.  UDC's second counterclaim, for

6    example, alleges that Blauw wasted corporate assets by: (1) failing to ensure proper

7    financial accounting; (2) incurring costs in remedying the failure to timely file VAT returns;

8    (3) incurring excessive overhead and labor costs; (4) commingling UDI's funds with his own;

9    and (5) siphoning UDI's funds to pay for his personal expenses.  None of these allegations

10   have anything to do with the parties' respective disputes with KDE, with the $1 million that

11   UDI claims it loaned to UDC, or with UDC's counterfeiting of the game-worn jerseys.

12   Likewise, UDC's third and fourth counterclaims arise out of an alleged effort on Blauw's

13   part, over a two-year span when McWilliam was medically incapacitated, to obtain a

14   majority interest in UDI.  That lacks any apparent connection with the KDE disputes, the

15   loan, and the counterfeit jerseys.

16        At best, *maybe* UDC has a compulsory counterclaim for breach of fiduciary duty

17   based upon Blauw's unwillingness to participate in joint settlement negotiations with KDE

18   in order to protect his own legal and economic interests, and the fact that he ultimately

19   settled with KDE for entirely too much money. (*See* FACC ¶¶ 26, 27, 31, 32, 91(g).)  Such

20   a counterclaim might have a logical relationship to UDI's claim that UDC entered into

21   settlement negotiations with KDE and not only disregarded UDI's interest in settling with

22   KDE but actually represented that UDI wanted no part in them.[2]  (*See* FAC ¶ 23–24.)  The

23   _____

24        [2] UDC makes this point in its opposition brief:

25             The Konami case, and eventual settlement, also ties the two
             pleadings.  UDI claims that it was improperly cut out of a
26           settlement that left it exposed.  UD Nevada, on the other hand,
             claims that UDI and Mr. Blauw actually *wanted* to stay out of the
27           settlement and that, eventually, when engineering a subsequent
             settlement with Konami, did so in a manner that was harmful to
28           UDI and its shareholders and in a way that was meant only to
             protect Mr. Blauw's conflicting personal interests.

1   problem is that UDC doesn't tailor its counterclaim in this way—and it's not the Court's role

2   to take a scalpel to the counterclaim and carve off a potentially compulsory counterclaim

3   from a slab of unrelated grievances.  Rather than limit its fiduciary duty claim to Blauw's

4   conduct relative to the KDE settlements, UDC ties it to the misstatement of financial data,

5   the commingling of business and personal funds, the failure to file timely financial

6   disclosures, the refusal to supply documents required by a tax audit, the waste of UDI funds

7   on excessive overhead and labor, the settling of another lawsuit without McWilliam's

8   approval, the investment of UDI funds in other business ventures without proper approval,

9   and capturing profits from a concealed intellectual property deal.  (*See* FAC ¶ 91.)  Viewed

10  as a whole, this catalog of grievances against the manner in which Blauw conducted UDI's

11  business is not logically connected to whether UDC owes UDI $1 million, or to whether

12  UDC's counterfeiting of Yu-Gi-Oh! cards and game-worn jerseys compromised UDI's

13  business prospects.  Allowing that they are compulsory counterclaims would fundamentally

14  re-define what this case is about.

15          UDC puts up a good fight that its counterclaims are, in fact, compulsory, but the

16  Court simply isn't persuaded by its arguments.  For example, UDC argues that "UDI and Mr.

17  Blauw intentionally mischaracterizing this money as a 'loan' is just one example of a fraud

18  or breach by UDI and Mr. Blauw that supports the counterclaims."  (UDC Opp'n Br. at 7.)

19   It later makes clear the counterclaim it supports is the counterclaim for breach of fiduciary

20  duty: "UDI and Mr. Blauw's breach of contract claim concerns a 'loan' and one of UD

21  Nevada's counterclaims (for breach of fiduciary duty) also focuses on this 'loan' (e.g., its

22  intentional mischaracterization as a 'loan')."  (UDC Opp'n Br. at 9.)  As the Court reads

23  UDC's counterclaim, however, the "mischaracterization" of the loan is simply a defense to

24  UDI's breach of contract claim—and *not* a basis, much less *the* basis, of its breach of

25  fiduciary duty counterclaim. The word "loan" doesn't even appear in the breach of fiduciary

26

27  (UDC Opp'n Br. at 9.)  But even here, as UDI points out in its reply, UDI's claims relate (and
    perhaps relate only tangentially) to the KDE lawsuit in the United States, while UDC's
28  counterclaim against Blauw relates to the manner in which he handled the KDE lawsuit in
    Europe.

11cv1741

duty counterclaim, even though UDC identified *fifteen* particular grievances against Blauw that give rise to it. (*See* FACC ¶¶ 91(a)–(q).

UDC also argues that its counterclaim for rescission of the agreement whereby Blauw obtained a majority interest in UDI is intimately related to UDI's claims. (UDC Opp'n Br. at 8.) Why? Because *if* the Court rescinds the agreement "then many of UDI's causes of action evaporate." (*Id.*) There are two problems here. One, in determining whether counterclaims are compulsory the Court is to look at the essential facts giving rise to the counterclaims and the original claims and ask if they're the same facts. *Pochiro*, 827 F.2d at 1249. *See also* Fed. R. Civ. P. 13(a)(1)(A) (counterclaims must "arise[ ] out of the transaction or occurrence that is the subject matter of the opposing party's claim"). It needn't necessarily consider whether the ultimate resolution of the counterclaims would have some implication for the outcome of the underlying lawsuit. But two, and more importantly, UDC doesn't spell out just how a potential rescission of the purchase agreement would "evaporate" UDI's claims. If the Court finds, for example, that the purchase agreement should be rescinded, presumably UDI would still exist as an entity and as such it could still pursue $1 million that it believes it loaned to UDC and was never repaid. Similarly, it could pursue a claim that UDC engaged in a counterfeiting scheme in 2008 and 2009 that had adverse business consequences for UDI. Perhaps what UDI means to argue is that if the purchase agreement is rescinded, Blauw would have no interest in UDI and this case would reduce to McWilliam suing himself.[3] But as UDI points //

---

[3] This, anyway, is what the Court makes of the following from UDC's opposition brief:

> UDI and Mr. Blauw, in their original complaint, operate under the assumption that Mr. Blauw controls UDI, i.e. that, through BOE, Mr. Blauw controls a majority of the shares in UDI. This squarely implicates the counterclaim for conversion and declaratory relief which seeks a finding that Mr. Blauw does *not* control UDI in such a manner (and, hence, could not bring any of these claims in the first place).

(UDC Opp'n Br. at 9.)

11cv1741

1    out in its reply, Blauw has been and remains UDI's Chief Executive Officer.  Presumably,

2    that enables him to initiate lawsuits by UDI itself.

3         As the Court reads UDC's overall argument that its counterclaims are compulsory,

4    UDC wants the Court to believe that there's a bigger picture to this case that UDI's claims

5    obscure and that its own counterclaims bring to light.[4]  That may be true, but there's nothing

6    to prevent UDC from painting that bigger picture in defending this case. It doesn't need to

7    file a counterclaim to do that.  Moreover, the "transaction or occurrence" standard for

8    counterclaims focuses on the facts giving rise to the counterclaims, not on whether litigating

9    the counterclaims might shed some light on the merits of the underlying claims.  The Court

10   therefore rejects UDC's arguments that its counterclaims are compulsory.  They don't arise

11   out of UDI's alleged loan to UDC, nor do they arise out of UDC's alleged acts of

12   counterfeiting and the impact of those acts on UDI's business relationships and prospects.

13   Taken as a whole, they relate to the manner in which Blauw ran UDI and usurped

14   ownership of UDI.  They can only be *permissive* counterclaims.

15        **B.    Does the Court Have Jurisdiction Over the Permissive Counterclaims?**

16        The Court cannot consider the permissive counterclaims unless there is some

17   independent basis for subject matter jurisdiction.   UDC argues that there's diversity

18   jurisdiction under 28 U.S.C. § 1332.  More than $75,000 is at issue and the counterclaims

19   are between "citizens of a State and citizens or subjects of a foreign state."  28 U.S.C. §

20   1332(a)(2). Specifically, UDC and McWilliam are citizens of the United States and UDI and

21   Blauw are citizens of the Netherlands.  (UDC Opp'n Br. at 12.)

22   //

23   ───────────────

24        [4] For example, UDC argues:

25           In short, the happenings between these entities (UDI and UDC
             and their shareholders) as well as the relationship between Mr.
26           Blauw and Mr. McWilliam during this time frame must be
             understood and appreciated — both with regard to the Konami
27           lawsuits, the 'loan,' and the internal workings of the various
             Upper Deck entities — in order to fully resolve this dispute on
28           the merits.

     (UDC Opp'n Br. at 8.)

1    UDI objects to that because UDC's counterclaims, by its own admission, were

2    assigned to it by UD BV, McWilliam's Netherlands-based holding company for UDI before

3    he allegedly transferred a 52.5 percent interest in UDI to Blauw's company Blue Ocean

4    Entertainment:

5             UD Nevada was assigned these causes of action by Upper
              Deck B.V.  UD BV was once the 100% owner of UDI and after
6             the (invalid) transfer of the 52.5% ownership-stake, maintained,
              at a minimum, the remaining 47.5%.  UD BV was incorporated
7             on January 13, 1998.  UD BV is the holding company to which
              Upper Deck International, B.V. is the operating company.  UD
8             BV, owner and parent company of UDI, assigned its rights and
              remedies regarding its interest in UDI to Upper Deck Nevada
9             prior to the filing of this counterclaim.

10   (FACC n.1.)  Barring this assignment, UDI argues, the counterclaims at issue would belong

11   to UD BV—and the parties on both sides of this case would all be residents of the

12   Netherlands.  But more importantly, this assignment *is* barred, according to UDI, by 28

13   U.S.C. § 1359, which denies a district court jurisdiction of "a civil action in which any party,

14   by assignment or otherwise, has been improperly or collusively made or joined to invoke the

15   jurisdiction of such court."  The purpose of § 1359 is to "prevent the manufacture of Federal

16   jurisdiction by the device of assignment."  *Kramer v. Carribean Mills, Inc.*, 394 U.S. 823, 826

17   (1969).  *See also U.S. Fidelity and Guar. Co. v. Lee Investments LLC*, 641 F.3d 1126, 1132

18   (9th Cir. 2011) ("The purpose of § 1359 is to prevent the perpetration of fraud on federal

19   courts' jurisdiction.").

20       There are at least two strong reasons to find that the transfer at issue here was

21   collusive or improper under § 1359, and that the Court therefore lacks jurisdiction over

22   UDC's counterclaims.

23       First, a presumption of collusion attaches whenever the transferor realistically retains

24   some pecuniary interest in the transferred claims.  *Nike, Inc. v. Commercial Iberica de*

25   *Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991–92 (9th Cir. 1994).  In *Nike*, the Ninth Circuit

26   called particular attention to transfers between corporations and officers or directors, as well

27   as transfers between parent companies and subsidiaries.  It's very hard to distinguish such

28   transfers from the transfer at issue here.  UD BV and UDC are both controlled by

1   McWilliam, and they're also related corporate entities.  A presumption of collusion has to

2   attach.  *See McCulloch v. Velez*, 364 F.3d 1, 6 (1st Cir. 2004) ("Because such assignments

3   [between related parties] are highly suspect, they are presumptively ineffective to create

4   diversity jurisdiction."); *Attorneys Trust v. Videotape Computer Products, Inc.*, 93 F.3d 593,

5   596 (9th Cir. 1996) ("[Collusion] is most likely to be [found] where there is an excellent

6   opportunity for manipulation, as in transfers between corporations and their subsidiaries or

7   transfers to a shell corporation.").

8            Second, the Ninth Circuit has identified factors to be considered in determining

9   whether an assignment is collusive, but UDC doesn't address any of them.  It's relevant: (1)

10  whether good business reasons justified the assignment; (2) whether the assignment was

11  timed to coincide with litigation; (3) whether the assignee gave any consideration; (4)

12  whether the assignment was partial or complete; and (5) whether there was an admission

13  the assignment was made to create jurisdiction.  In the face of these considerations, UDC

14  addresses the assignment only in the footnote excerpted above.  It doesn't explain why the

15  assignment was made, it doesn't say what consideration, if any, was given for the

16  assignment, and as for the timing, it only says that the assignment was made prior to the

17  filing of the counterclaim—which leaves open the possibility that it was made after the

18  commencement of this lawsuit.  It is UDC's burden to show that the assignment was neither

19  improper nor collusive, and it doesn't even try to do that.  *See  Airlines Reporting Corp. v.*

20  *S and N Travel, Inc.*, 58 F.3d 857, 863 (2d Cir. 1995).  In its opposition brief, in fact, UDC

21  essentially rolls over and moves on to another argument; it makes the very general point

22  that diversity can be created through a bona fide assignment, but it offers *nothing* to show

23  that its own assignment was bona fide.  (UDC Opp'n Br. at 12.)  In light of this, the Court

24  finds that the assignment of the counterclaims from UD BV to UDC was collusive and

25  cannot give rise to diversity jurisdiction.  *See* 28 U.S.C. § 1359.

26          UDC's last-ditch argument is that it doesn't need the transfer to establish diversity

27  jurisdiction.  Even if UD BV brought the counterclaims, diversity jurisdiction would exist. The

28  Counterclaimants would be UD BV (Netherlands) and McWilliam (Nevada), and the

1    Counterclaim Defendants would be UDI (Netherlands), Blue Ocean Entertainment
2    (Netherlands), Blauw (Texas), and Larissa Blauw (U.S. citizen of an unknown state).  (UDC
3    Opp'n Br. at 12.).  UDC is right about the jurisdictional principle: as long as the United
4    States parties are diverse, the fact that aliens are on both sides does not defeat diversity
5    jurisdiction.  *Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1298 (1985).  But
6    there are two other problems with UDC's position.

7         First, it doesn't do much good to say that diversity jurisdiction would exist "if UD BV
8    (alien) brought the suit itself" because UD BV *didn't* bring the counterclaims.  In fact, UD BV
9    *couldn't* bring the counterclaims because it's not a named defendant.  UDI sued UDC and
10   McWilliam; the only possible counterclaims are the counterclaims that UDC and McWilliam
11   can bring.

12        Even if the Court is wrong about this, however, it is highly questionable whether
13   Blauw is a resident of Texas and Larissa Blauw is a resident of the United States for the
14   purposes of diversity jurisdiction.  UDC alleges in its counterclaim that Blauw resides in the
15   Netherlands and is a citizen of both the United States and the Netherlands—but it makes
16   no allegation that Blauw is a resident of Texas in particular.  (FACC ¶ 7.)  This allegation
17   appears, for the first time, in UDC's opposition brief, admittedly supported only by
18   "information and belief."  (UDC Opp'n Br. at n.5.)  The only contacts of Blauw with the
19   United States that appear in UDC's counterclaim involve short intervals of time during
20   McWilliam's illness when Blauw ran UDC and UDI from Carlsbad, California.  He ran the
21   companies for four weeks beginning on March 23, 2009 and two weeks beginning
22   September 11, 2009.  (FACC ¶¶ 53, 55.)  Blauw was also in California, apparently, in
23   September 2010, allegedly to steal control of UDI from McWilliam.  (FACC ¶ 65.)  Blauw
24   concedes that he's a United States citizen, but that is only because he was born in Texas
25   (where he lived until he was six years old).  (Blauw Decl., Dkt. No. 50-1, ¶ 2.)

26        "An individual's state citizenship, for diversity purposes, is determined by the state
27   in which they're domiciled."  *Liberty Natural Products, Inc. v. Hoffman*, 2011 WL 4625703
28   at *2 (D. Or. 2011) (citing *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001)).

1   A individual's domicile, in turn, is his permanent home, where [ ]he resides with the intention

2   to remain or to which [ ]he intends to return." *Kanter*, 265 F.3d at 857.  This is all to be

3   determined "based on the status of [a party] at the outset of the case." *Harris v. Bankers*

4   *Life and Cas. Co.*, 425 F.3d 689, 695–96 (9th Cir. 2005).  It's clear that Blauw is domiciled

5   abroad.  The fact that he was born in Texas, or that he made several trips to California while

6   McWilliam was ill, does not make him a resident of Texas for jurisdictional purposes.  The

7   case for Larissa Blauw being a United States resident is even weaker.  Again, UDC's

8   counterclaim alleges no facts to establish citizenship or residency (it alleges simply that

9   Larissa Blauw has traveled to California dozens of times), and Blauw's declaration confirms

10  that Larissa Blauw is a Dutch citizen who has never lived in the United States.  (Blauw

11  Decl., Dkt. No. 50-1, ¶ 8.)

12       In light of the above, the Court finds insufficient support to establish that Blauw is a

13  resident of Texas, or that Larissa Blauw is a resident of any state, for jurisdictional

14  purposes.  Diversity jurisdiction turns on individuals' place of domicile, and  the UDC offers

15  no evidence that the Blauws are domiciled anywhere other than the Netherlands.[5] So, even

16  assuming the Court were to let UD BV assert counterclaims in this case, they would be

17  counterclaims brought by a Netherlands-based company against other Netherlands-based

18  parties.  UDC's argument that diversity jurisdiction exists therefore fails, and that means its

19  counterclaims aren't permissive.[6] And *that* means they should be, and are, **DISMISSED**

20  ─────────────────────────

21       [5] In fact, "[a] United States citizen, domiciled abroad, is not a 'citizen of a State' for

22  purposes of diversity jurisdiction and as such that person cannot sue or be sued in federal
    court on the basis of diversity jurisdiction." *Piatek v. Piatek*, 2009 WL 273228 at *1 (W.D.
    Wash. Feb. 4, 2009) (citing *Brady v. Brown*, 51 F.3d 810, 815 (9th Cir. 1995)).

23

24       [6] Anticipating this ruling, UDC asks the Court for leave to conduct targeted
    jurisdictional discovery so it can amend its counterclaim "to reflect the true citizenship" of the
    Blauws.  (FACC at n.1.)

25       That request is denied.  Jurisdictional discovery "may be appropriately granted where

26  pertinent facts bearing on the question of jurisdiction are controverted or where a more
    satisfactory showing of the facts is necessary." *Data Disc, Inc. v. Systems Tech. Assoc.,*

27  *Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1997).  The mere hunch, however, that discovery
    might yield some jurisdictionally helpful facts isn't sufficient. *Boschetto v. Hansing*, 539 F.3d

28  1011, 1020 (9th Cir. 2008).  Likewise, a court needn't permit jurisdictional discovery where
    a plaintiff's claim that jurisdiction exists "appears to be both attenuated and based on bare
    allegations in the face of specific denials made by the defendants." *Terracom v. Valley Nat.*

1   **WITHOUT PREJUDICE**.

2   **II.    McWilliam's Defamation Counterclaim**

3          The Court address McWilliam's defamation counterclaim separately because UDI's

4   arguments for dismissal of the claim don't overlap, at least exactly, with its arguments for

5   dismissal of the other counterclaims.  Specifically, even if the defamation counterclaim isn't

6   compulsory (and the Court agrees with UDI that it's not, under the same analysis above),

7   it might be permissive because there's an argument that complete diversity exists.

8   McWilliam resides in Nevada, and UDI and the Blauws are foreign.  *See*  28 U.S.C. §

9   1332(a)(2).  UDI therefore needs some additional, independent arguments for dismissing

10  it.[7]

11         UDI's first argument is that McWilliam answered its original complaint and can't

12  assert a counterclaim after having done so.  Indeed, McWilliam answered early in this

13  litigation, on September 29, 2011, the same day that UDC answered.  (Dkt. Nos. 10–12.)

14  Also on that day, UDC filed its original counterclaim and did not include McWilliam as a

15  counterclaimaint.  (Dkt. No. 9.)  It wasn't until UDC filed an amended counterclaim, on

16  December 12, 2011, that McWilliam joined as a counterclaimant and accused UDI and the

17  Blauws of defamation.  (Dkt. No. 31.)  McWilliam's way around this argument is to call his

18  counterclaim an amended answer, and then invoke Fed. R. Civ. P. 15, which allows parties

19  to amend their pleadings once as a matter of course.  There's no doubt that McWilliam's

20  "amendment" to his complaint is inelegant.  Ideally, he should have filed his counterclaim

21

22  *Bank*, 49 F.3d 555, 562 (9th Cir. 1995).  A party that wants to take jurisdictional discovery
    must make at least a colorable showing that jurisdiction exists.  *Mitan v. Feeney*, 497
23  F.Supp.2d 1113, 1119 (C.D. Cal. 2007).
            These legal standards cut heavily against UDC.  As the Court has explained, diversity
24  jurisdiction here turns on the Blauws state of domicile, and there is *no* evidence that they are
    domiciled anywhere other than the Netherlands.  UDC has nothing other than blind hope that
25  additional, helpful jurisdictional facts will turn up, and that's an inadequate basis for allowing
    jurisdictional discovery in the first place.
26

27         [7] One of UDI's arguments—that McWilliam cannot simultaneously argue that he was
    medically incapacitated *and* defamed as being a bad and incompetent business
28  person—does not deserve serious consideration.  Obviously, the spirit of McWilliam's
    defamation is that the Blauws did more than just inform McWilliam's associates that he was
    ill.

1   along with his answer, as UDC did.  And if he really wanted to amend his answer, that's

2   what he should have done, rather than tack on a counterclaim to UDC's amended

3   counterclaim and *call* that an amended answer.  But accepting that it is an amendment, it

4   is timely under Fed. R. Civ. P. 15(a)(1)(B).  Assuming it isn't timely, the Court would still

5   grant McWilliam leave to amend his answer under Rule 15(a)(2).  So, the Court rejects

6   UDI's first argument for the dismissal of McWilliam's defamation counterclaim.

7           UDI's second argument is that McWilliam doesn't allege adequate facts to state a

8   defamation claim.  Here are the facts he does allege:

9               Throughout 2010, Mr. and Mrs. Blauw, on several occasions,
            made false and defamatory statements regarding Mr.
10          McWilliam to Mr. Brian Grey, various associates of Mr.
            McWilliam, and to other members of the relevant business
11          community.

12              The statements falsely stated or implied that:

13              Mr. McWilliam cannot be trusted and is dishonest; and

14              Mr. McWilliam is a bad/incompetent, owner, executive, and
            member of the relevant business community.

15
                Mr. Blauw, Mrs. Blauw, and UDI's statements, which are
16          defamatory on their face, were false and were not privileged.

17              Mr. Blauw, Mrs. Blauw, and UDI's statements exposed Mr.
            McWilliam to contempt, ridicule, obloquy, and disgrace.  These
18          counterclaim defendants' statements were, at a minimum,
            made negligently, or with reckless disregard for their falsity.

19
                These statements were made with knowledge of their falsity
20          and impropriety and with actual malice.

21   (FACC ¶¶ 116–121.)  There's no dispute that defamation claims have to be pleaded with

22   specificity in a complaint.  "At a minimum, necessary defamation allegations must identify

23   the time and place of publication as well as the speaker, the recipient of the statement,

24   [and] the substance of the statements . . . ."  *Eldorado Stone, LLC v. Renaissance Stone,*

25   *Inc.*, 2005 WL 5517731 at *3 (S.D. Cal. 2005) (citing 5 Charles A. Wright & Arthur R. Miller,

26   *Fed. Prac. and Proc.: Civil 3d,* § 1309 (2004)).   The statements must be specifically

27   identified if not set forth verbatim.  *Roe v. Doe*, 2009 WL 1883752 at *15 (N.D. Cal. 2009)

28   (citing *Vogel v. Felice*, 127 Cal.App.4th 1006, 1017 n.3 (Cal. Ct. App. 2005)).  Is it enough

1  to allege that "throughout 2010" the Blauws told Brian Grey and unnamed associates of

2  McWilliam that he couldn't be trusted, is dishonest, and is incompetent?  No.  This reduces

3  to the general allegation that over some extended period of time the Blauws said negative

4  things about McWilliam to others, and that falls far short of identifying particular defamatory

5  statements.[8]

6        The next question for the Court is whether to allow McWilliam to amend his

7  counterclaim.  Rule 15 of the Federal Rules of Civil Procedure mandates that leave to

8  amend "be freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is

9  to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d

10  1048, 1051 (9th Cir. 2003).  *See also Foman v. Davis*, 371 U.S. 178, 182 (1962) (implying

11  leave to amend should be granted in the absence of undue delay, bad faith or dilatory

12  motive, or undue prejudice to the opposing party or futility of amendment).

13        Now, the Court can't avoid UDI's argument that it and the Blauws aren't "opposing"

14  parties within the meaning of Fed. R. Civ. P. 13 and therefore can't be named as

15  Counterclaim Defendants.  To be more precise, UDI argues that *it* is not an "opposing" party

16  with respect to the first three counterclaims (for breach of fiduciary duty, waste of corporate

17  assets, and conversion), but the Court has already dismissed those counterclaims from this

18  case.  (*See* UDI Mot. to Dismiss at 7–8.)  With respect to the defamation counterclaim, UDI

19  argues only that Blauw and Larissa Blauw are not opposing parties.  (*See* UDI Mot. to

20  Dismiss at 8 ("Thus, even if the Court somehow finds that UDI is an 'original party' for

21  purposes of the first three counterclaims (it should not), all claims must be dismissed to the

22  extent they involve non-parties to the Complaint: The Blauws and BOE.").)  This argument

23  has no force, however, with the defamation counterclaim because UDI *is* an opposing party,

24  and UDI itself admits that counterclaims can't be filed *solely* or *entirely* against new parties.

25  (UDI Mot. to Dismiss at 7.)  Nothing prevents McWilliam, then, from bringing a counterclaim

26

27        [8] The Court also notes that while McWilliam accuses UDI, Blauw, and Larissa Blauw of defamation, his more specific accusations leave out UDI.  (*See* FACC ¶ 116.)  They also, arguably, leave out Larissa Blauw.  (*See* FACC ¶ 117 ("Mr. Blauw made these false and defamatory statements . . . .").)  This is more evidence that McWilliam's defamation claim is imprecisely pled.

28

1    against UDI for defamation on a vicarious liability theory and including the Blauws in that

2    counterclaim.[9]

3         McWilliam's request for leave to amend his defamation claim is nonetheless denied.

4    The reason is simple: in his opposition to UDI's motion to strike the claim, McWilliam pleads

5    in essence a very different defamation claim, and neither the Court nor UDI should have to

6    tolerate that kind of inconsistency.  In his actual counterclaim, McWilliam alleges that Blauw

7    told associates of McWilliam, members of the business community, and someone named

8    Brian Grey that McWilliam couldn't be trusted and is both dishonest and incompetent.

9    (FACC ¶¶ 116–121.)  That's it.  In his opposition to the motion to strike, however, a new

10   recipient of the defamation comes up (and Brian Grey disappears): a Mr. VanDoorn,

11   identified as UDI's handyman.  (Strike Opposition at 8.)  New defamatory remarks also

12   come up.  McWilliam alleges that Blauw said he: (1) was the main problem at UDI; (2) was

13   making a joke of UDI; (3) refused to visit UDI when Blauw asked him; (4) took credit for

14   business ideas that were Mr. Blauw's; (5) would bankrupt UDI, shut it down, and terminate

15   all of its employees; (5) was going to reduce the salaries of all UDI employees; and (6) was

16   going to sell UDI for liquidation.  First, some of these alleged statements aren't even

17   defamatory.[10]  But second, as the Court just indicated, they come out of nowhere in

18   McWilliam's opposition to UDI's motion to strike, when they should appear front and center

19

_____

20        [9] UDI's arguments on this issue are inconsistent.  First, it argues that "[a]
     counterclaim—permissive or compulsory—'cannot be asserted entirely against third
21   parties . . . one of the parties to the counterclaim must be an opposing party.'" (Mot. to
     Dismiss at 7 (quoting Rutter on Fed. Civ. P. 8:125, 127).)  One page later, it differentiates
22   compulsory from permissive counterclaims and argues that the latter "may only be against
     parties to the complaint."  (Mot. to Dismiss at 8.)  It cites for this proposition Fed. R. Civ. P.
23   13(b), but nothing in the text of Rule 13(b) limits permissive counterclaims to opposing
     parties.  Nor can the Court find authority elsewhere for that construction of it.
24

25        [10] A slanderous statement for the purposes of this case is one that injures someone
     in his profession by suggesting either that he is ill-qualified for it or by imputing something
26   to him that will lessen his profits.  *See* Cal. Civ. Code § 46(3).  It's far from clear how Blauw's
     alleged statement that McWilliam planned to reduce the salaries of UDI employees could
27   be slanderous.  It may have been false, of course, but by itself it doesn't carry any
     substantive critique of McWilliam's job performance.  McWilliam also alleges that Blauw put
28   him on a chair in front of company headquarters when he was incapacitated, which
     subjected him to ridicule.  (Strike Opp'n at 15.)  This may be a tort of some kind, but it is very
     hard to map it onto the elements of slander.  *See* Cal. Civ. Code § 46.

1   in that portion of his counterclaim that alleges defamation.  There need to be consequences

2   for litigants who file inconsistent and inaccurate pleadings with the Court.  Here, the

3   appropriate consequence is to deny McWilliam leave to amend his defamation counterclaim

4   against UDI.  As with McWilliam's other counterclaims, this dismissal is **WITHOUT**

5   **PREJUDICE**.

6                                          **UDI'S MOTION TO STRIKE**

7           This brings the Court to UDI's motion to strike McWilliam's defamation counterclaim

8   under California's anti-SLAPP statute, Code of Civil Procedure § 425.16.  The Court can't

9   deny the motion as moot because UDI seeks costs and attorneys' fees, as allowed by the

10  statute, for having to defend against the counterclaim.

11  I.    **Legal Standard**

12          California's anti-SLAPP statute "allows dismissal, at an early stage, of a lawsuit

13  designed primarily to chill the exercise of First Amendment rights."  *Simmons v. Allstate Ins.*

14  *Co.*, 92 Cal.App.4th 1068, 1070–71 (2001).  Specifically, the statute provides that "[a] cause

15  of action against a person arising from any act of that person in furtherance of the person's

16  right of petition or free speech under the United States Constitution or the California

17  Constitution in connection with a public issue shall be subject to a special motion to strike."

18  Cal. Code Civ. P. § 425.16(b)(1).

19          To prevail on such a motion, UDI must make "a threshold showing" that the

20  challenged cause of action in fact arises from an act in furtherance of Blauw's First

21  Amendment rights.  *Gallanis-Politis v. Medina*, 152 Cal.App.4th 600, 609 (2007); *see also*

22  *Equilon Enter. v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002).  The statute defines

23  these acts to include:

24                  (1) any written or oral statement or writing made before a
                    legislative, executive, or judicial proceeding, or any other official
25                  proceeding authorized by law, (2) any written or oral statement
                    or writing made in connection with an issue under consideration
26                  or review by a legislative, executive, or judicial body, or any
                    other official proceeding authorized by law, (3) any written or
27                  oral statement or writing made in a place open to the public or
                    a public forum in connection with an issue of public interest, or
28                  (4) any other conduct in furtherance of the exercise of the
                    constitutional right of petition or the constitutional right of free

                                          - 20 -

speech in connection with a public issue or an issue of public interest.

C.C.P. § 425.16(e).  The entire anti-SLAPP statute is to be construed broadly.  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106, 1119 (1999). For example, "the definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." *Damon v. Ocean Hills Journalism Club*, 85 Cal.App.4th 468, 479 (2000).

Assuming UDI can make the requisite threshold showing that the challenged cause of action arose from an act in furtherance of free speech, the burden shifts to McWilliam to demonstrative a likelihood of prevailing on the cause of action.  Cal. Code Civ. P. § 425.16(b)(1).  He "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Rusheen v. Cohen*, 37 Cal.4th 1048, 1056 (2006) (internal quotations omitted).

II.   **Discussion**

The Court first asks whether Blauw's alleged defamatory statements were made in furtherance of his First Amendment rights in connection with a public issue.  UDI is right that the vague manner in which McWilliam pleads defamation makes this question hard to answer.  Certainly, if the statements were made in or before the courts presiding over the litigation with KDE, or even if they were made in connection with those cases, the anti-SLAPP statute protects them and McWilliam must show a likelihood of prevailing on the merits.  The Court does not, however, sense that the allegedly defamatory statements McWilliam has in mind have anything to do with the KDE litigation—and McWilliam insists they do not.  (Strike Opposition at 7–8.)  That leaves the catchall category of "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  C.C.P. § 425.16(e)(4).

1    The Court well understands that the phrases "public issue" and "issue of public

2    interest" should be construed broadly, and may even encompass some private conduct.

3    *Damon*, 85 Cal.App.4th at 479.  But that private conduct must "impact[ ] a broad segment

4    of society and/or . . . affect[ ] a community in a manner similar to that of a governmental

5    entity."  *Id.  See also Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal.App.4th

6    515, 522 (Cal. Ct. App. 2006); *Church of Scientology v. Wollersheim*, 42 Cal.App.4th 628,

7    650 (Cal. Ct. App. 1996) ("Although matters of public interest include legislative and

8    governmental activities, they may also include activities that involve private persons and

9    entities, especially when a large, powerful organization may impact the lives of many

10   individuals.").  The statements at issue here were made in private and concerned an

11   ostensibly private matter, namely McWilliam's business acumen and his fitness to run

12   Upper Deck, a privately held company.  That conduct can hardly be said to impact "a broad

13   segment of society" or impact "a community in a manner similar to that of a governmental

14   entity."  And while Upper Deck may be a popular company in the narrow circle of those who

15   collect trading cards, in no way is it analogous to the Church of Scientology as "a large,

16   powerful organization" that "impact[s] the lives of many individuals."[11]

17   UDI's best argument, probably, is that McWilliam is a person in the public eye, and

18   so any statements about him—even those made in private and concerning his private

19   conduct—necessarily implicate the public's interest.  *See Hilton v. Hallmark Cards*, 580 F.3d

20   874, 888 (9th Cir. 2009).  This argument isn't frivolous, but the Court ultimately rejects it.

21   Upper Deck is in no way synonymous, in the card-collecting public's mind, with McWilliam,

22   and the fact that the Upper Deck entities are privately held dents substantially the public's

23   interest in their internal affairs.  UDI relies on *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th

24   1027 (Cal. Ct. App. 2008), and it's worth saying something about, and distinguishing, that

25   case.  The statements at issue in *Nygard*, which concerned the working conditions at

26   plaintiff Nygard's company  and his allegedly lavish lifestyle, were made during a magazine

27

28        [11] The  Court  repeats  this  language  because  UDI  bolds  it  in  its  own  citation  to
     *Wollersheim*, presumably to suggest that it applies to Upper Deck.

1   interview and subsequently published.  *Id.* at 1032.  In granting an anti-SLAPP motion to

2   strike Nygard's complaint, the lower court found that Nygard and his company were

3   internationally known and highly visible public figures who spent substantial money

4   promoting their success and lifestyle.  *Id.* at 1034.  The Court of Appeal agreed:

5           According to evidence introduced by defendants in support of
            their motions to strike, there is 'extensive interest' in Nygard—"a
6           prominent   businessman   and   celebrity   of   Finnish
            extraction"—among the Finnish public.  Further, defendants'
7           evidence suggests that there is particular interest among the
            magazine's readership in "information having to do with Mr.
8           Nygard's famous Bahamas residence which has been the
            subject of much publicity in Finland."  The June 2005 article
9           was intended to satisfy that interest.

10  *Id.* at 1042.  It's certainly true that there's significant public interest in Upper Deck's battles

11  with KDE.  (Hamler Decl., Exs. 4–10.)  There's also some general interest in Upper Deck's

12  place in the card-collecting world.  A book was written about the company in 1995, and as

13  recently as April 2010 a news article detailed Upper Deck's loss of a licensing deal to

14  produce NFL playing cards and its related demise as the trading card industry has evolved.

15  (Hamler Decl., Ex. 11.)   That article quoted two industry insiders commenting on

16  McWilliam's ability to lead.  Even in the face of this, however, the Court doesn't find that the

17  alleged statements of Blauw giving rise to McWilliam's defamation counterclaim concerned

18  an issue of public interest.  The public may have an interest in what's become of Upper

19  Deck's place in the trading card industry, or what's become of that industry itself, but that

20  big-picture interest doesn't drill down to McWilliam's trustworthiness or competence as a

21  businessman and his private conduct at Upper Deck.  It doesn't, for example, extend to: (1)

22  whether McWilliam is trustworthy in business dealings; (2) whether McWilliam refused to

23  visit UDI when Blauw asked him to; (3) whether certain business ideas should be credited

24  to Blauw or McWilliam; or (4) whether McWilliam planned to either terminate or reduce the

25  salaries of UDI employees.  Blauw's allegedly defamatory statements relate behind-the-

26  scenes disputes between McWilliam and Blauw that are peripheral to that aspect of Upper

27

28

1  Deck's business in which the public is interested.[12]  For this reason, the Court finds that UDI

2  has not made the threshold showing that Blauw's allegedly defamatory statements were

3  made in connection with an issue of public interest, and its anti-SLAPP motion to strike the

4  defamation counterclaim is **DENIED**.

## CONCLUSION

6      In one of the news articles that UDI attached to its anti-SLAPP motion, this case is

7  analogized to "a Jerry Springer family dispute." (Hamler Decl., Ex. 12.)  That seems an apt

8  description.   There is a real legal dispute here—the Court doesn't want to minimize

9  that—but some of that dispute has all the characteristics of a pure shouting match.  In the

10  interest of streamlining this case and knocking it down to what can efficiently be litigated,

11  the Court summarizes its findings as follows:

12      All five counterclaims are **DISMISSED WITHOUT PREJUDICE**.  The first, second,

13  third, and fourth counterclaims aren't compulsory, and as permissive counterclaims the

14  Court lacks a basis for exercising diversity jurisdiction over them.  The fifth counterclaim

15  simply fails to state a claim under Fed. R. Civ. P. 12(b)(6), and McWilliam's lax pleading of

16  the claim will cost him leave to amend it.  UDI's motion to strike the defamation counterclaim

17  under California's anti-SLAPP statute is **DENIED**.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26

27      [12] Indeed, part of UDI's argument for the non-compulsory nature of the counterclaims
   is that they concern "the internal affairs of how a Dutch company . . . has been run by Mr.
28  Blauw . . . ."  (Reply Br. at 3.)   The defamation counterclaim in particular concerns
   statements Blauw allegedly made in, and about, those internal affairs.  They are not an issue
   of public interest.

1    There are a number of arguments that the Court hasn't addressed because it doesn't

2  need to.  For example, UDI argues in its motion to dismiss the counterclaims that the

3  purchase agreement contains an enforceable forum selection clause committing any

4  disputes arising out of it to the jurisdiction of Netherlands courts applying Dutch law.  And

5  Blauw argues in his motion to dismiss the counterclaims that the Court lacks personal

6  jurisdiction over him.  If UDC and McWilliam choose to re-file their counterclaims as a

7  separate action in this Court, UDI and Blauw may again raise these and any other

8  arguments that the Court hasn't addressed above.

9

10    **IT IS SO ORDERED**.

11  DATED:  May 11, 2012

12

13  **HONORABLE LARRY ALAN BURNS**
United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28